IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANTONIO C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANTONIO C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

VENETRIA M., APPELLANT.

Filed June 2, 2026.   No. A-25-799.

Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

David P. Thompson, of Thompson Law, P.C., L.L.O., for appellant.

Ellie K. Harris, Deputy Lancaster County Attorney, and Betsey E. Williams, Senior Certified Law Student, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Venetria M. appeals from the order of the separate juvenile court of Lancaster County terminating her parental rights to Antonio C. She contends that the juvenile court erred in finding that statutory grounds existed to terminate her parental rights and finding that termination was in Antonio's best interests. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Venetria is the biological mother of Antonio, born in August 2023. Antonio's father voluntarily relinquished his parental rights and is not part of the appeal.

Beginning in November 2023, DHHS worked with Venetria, Antonio's father, and Antonio on a voluntary basis after receiving an intake alleging Antonio's parents neglected him, were engaged in domestic violence, were exhibiting mental health concerns, and had threatened to kill Antonio. On January 29, 2024, the State filed a motion and affidavit for emergency protective custody of Antonio, due to both parents' current mental health conditions. On January 30, the court granted the motion, and Antonio was removed from his parents' care.

In March 2024, the State filed an amended petition alleging that Antonio was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) as Antonio lacked proper parental care by reason of the fault or habits of Venetria and/or Antonio and was in a situation dangerous to his life or limb or injurious to his health or morals, based on the fact that Venetria had been diagnosed with and/or has untreated cognitive, developmental and/or mental health issues, which affect her ability to provide proper parental care and support for Antonio; that since November 2023, Venetria had made threats and/or comments to harm Antonio; that Venetria had been unable to provide adequate care and/or supervision for Antonio; and that Antonio was at risk of harm. At a March hearing, based upon Venetria's admissions, the court found that the allegations were true and found that Antonio was a child within the meaning of § 43-247(3)(a).

Following the adjudication, the juvenile court entered an interim order requiring Venetria to complete an initial diagnostic interview and/or a psychological evaluation, to cooperate with services recommended in the evaluations, and to cooperate with the family support worker. A dispositional hearing was held in May 2024 wherein the juvenile court ordered Venetria to sign releases of information as requested by the Department of Health and Human Services (DHHS); report any contact information changes; maintain contact with the case manager; maintain a safe, stable, and sober living environment; maintain employment or other legal source of income; participate in supervised visitation; participate in monthly family team meetings arranged by DHHS; report any contact with law enforcement to the case manager; complete a psychological evaluation; cooperate with a family support worker; abstain from the use or possession of controlled substances unless prescribed to her by a medical professional; and cooperate with random drug testing.

A review hearing was held in August 2024. The court continued Antonio's out-of-home placement and further ordered Venetria to complete a parenting assessment and the Circle of Security parenting program or other parenting education course. Following a December review hearing, the court continued the prior orders and ordered Venetria to continue taking her prescribed medications to manage her mental health conditions as diagnosed and follow the recommendations of the treating professional. In May 2025, following a review hearing, the juvenile court ordered that Venetria's visits with Antonio be therapeutically supervised.

## 2. MOTION FOR TERMINATION OF PARENTAL RIGHTS

In April 2025, the State filed a motion for termination of parental rights pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016) (substantial and continuous or repeated neglect and refusal to give child necessary parental care and protection); § 43-292(6) (reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to adjudication); § 43-292(7) (out-of-home placement for 15 or more months of the most recent 22 months); and that termination of Venetria's parental rights was in Antonio's best interests.

3. TRIAL

Trial on the State's motion to terminate Venetria's parental rights was held over 2 days in June and July 2025. The court received exhibits including the pleadings and court reports and heard testimony from Olivia Christensen, a therapist; Nakeysha Olson, a child and family services specialist; Venetria; and Crystal Butler and Timothy Eulberg, Venetria's roommates.

(a) Christensen's Testimony

Christensen, a licensed mental health practitioner and licensed drug and alcohol counselor, testified that she began working with Antonio in January 2025. Christensen testified that she began child-parent psychotherapy (CPP) with Antonio to help address concerning behaviors reported by Antonio's foster parents. Christensen testified that Antonio's treatment goals included body safety, co-regulation, enhancing understanding of his experiences through nurturing connections with his caregivers, creating environmental and emotional safety, creating stability within his life, and understanding his experiences from his relationships and how that has impacted his mental health.

Christensen testified that generally she engaged all caregivers in CPP who were willing to create safety for the child, but that Venetria had not engaged in any CPP sessions and that Venetria failed to attend a scheduled session with her. Christensen testified that due to concerns regarding Venetria's inconsistency in participating in visits with Antonio and the continued escalation in Antonio's behaviors as reported by the foster parents, in April 2025, Christensen recommended that visits between Antonio and Venetria be limited to therapeutically supervised visits. Christensen testified that, as of the time of trial, Venetria had not engaged in that service.

(b) Olson's Testimony

Olson testified that she was assigned as the caseworker in June 2024 and first met with Venetria the following month. Olson testified that Venetria had successfully completed some, but not all, of the court orders.

Olson testified that Venetria maintained contact with her throughout the case; reported any law enforcement contacts she had; maintained a legal source of income through her social security disability benefits; completed an initial diagnostic interview; completed a parenting assessment; and completed a psychological evaluation. However, Olson testified that Venetria had not signed certain releases of information, which had resulted in Olson being unable to confirm Venetria's participation or progress in those services. Further, Venetria had not maintained a safe and stable living environment; had not consistently maintained employment; had not consistently participated in visitations with Antonio; failed to complete a parenting education program; failed to consistently engage in family support; failed to consistently participate in drug testing; and failed to provide proof of compliance with mental health treatment.

Olson testified that, at times, Venetria would cease participating in court-ordered services because Venetria felt that certain services were unnecessary. Olson testified that Venetria failed to complete the Circle of Security parenting education course, despite five separate referrals. Venetria also discontinued drug testing and family support because she felt like she did not need the assistance or the service. At some point during the case, due to difficulties with getting Venetria to engage with or allow Antonio to undergo an early educational and developmental evaluation, the court appointed the foster parents as Antonio's educational surrogates. Olson testified that

despite offering Venetria agency transportation and bus passes based on Venetria's indications that transportation was a barrier to her participation throughout the case, Venetria's consistency in services did not improve.

Olson testified that in addition to Venetria's failure to comply with all of the court's orders, in April 2025, Venetria relocated to South Dakota and informed Olson that she was unsure whether she would return to Nebraska. Olson testified that on multiple occasions throughout the case, Venetria expressed her desire to relinquish her parental rights and indicated her unwillingness to engage in services.

Olson testified that she would be unable to recommend reunification in the near future because there had been only minimal correction of the behaviors that led to Antonio's removal, and she did not feel like reunification was in Antonio's best interests at that time. She further testified that Antonio deserved a chance to achieve permanency with a caretaker. Olson testified that throughout the case, she has been unable to recommend reunification, due to Venetria's inconsistencies in participating in parenting time, drug testing, and a parenting education course, and her inability to confirm Venetria's participation in mental health services.

### (c) Venetria's Testimony

Venetria acknowledged that she understood the concerns for her mental health when DHHS first began working with the family.

Venetria testified that prior to March 2025, she resided in a shelter, but after that date she had a safe and stable living arrangement in that she resided in an apartment with two roommates. Venetria further testified that she had been employed at Family Dollar for 3 weeks and she had held other jobs throughout the case. Venetria stated that she was willing to, and had, signed releases of information for the caseworker throughout the case; she completed a psychiatric evaluation; she was seeing a therapist; she regularly communicated with the caseworker; she participated in family support; she received social security disability as income; she attended family team meetings; she reported any law enforcement contact to the caseworker; she abstained from the use or possession of substances; she completed a parenting education course called Love and Logic through Centerpointe; she completed a parenting assessment; and, despite having some issues with consistency in her attendance at visitation, the visits she attended went well and she provided for Antonio's needs. The visitation notes admitted into evidence during the trial indicated that during visits, Venetria cared for Antonio's needs and no safety concerns were noted.

Venetria testified that during the case, she began having significant medical concerns related to her diabetes and scoliosis and she had issues with scheduling and transportation to visits. She stated that despite these issues, she made up missed visits with Antonio and provided for his needs. She further testified that concerns regarding domestic violence and her relationship with Antonio's father had been resolved when she obtained a protection order against Antonio's father, followed by his subsequent incarceration for violating the protection order. Venetria testified that she did not believe that termination of her parental rights was in Antonio's best interests.

### (d) Roommates' Testimony

Butler and Eulberg both generally testified that Venetria resided with them prior to Antonio's removal; that they believed Venetria was capable of parenting Antonio; and that

termination of Venetria's parental rights would not be in Antonio's best interests. Both generally testified that they believed Venetria was doing everything she could to have Antonio returned to her care. Butler testified that Venetria's mental health concerns were not really a problem and that Venetria was taking her medications as prescribed. Eulberg testified that Venetria was complying with the court-ordered services and that, on multiple occasions, he provided Venetria with transportation. Butler and Eulberg both testified that Venetria has provided assistance and childcare for them and that they trusted her with their child.

### 4. JUVENILE COURT ORDER

In October 2025, the juvenile court entered an order finding that statutory grounds existed to terminate Venetria's parental rights under § 43-292(2), (6), and (7) and finding that termination of Venetria's parental rights was in Antonio's best interests. Venetria has now appealed from the juvenile court's order terminating her parental rights.

## III. ASSIGNMENTS OF ERROR

Venetria assigns, restated and renumbered, that the juvenile court erred in (1) finding statutory grounds existed to terminate her parental rights under § 43-292(2) and (6); and (2) finding that termination of her parental rights was in Antonio's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *Id.* However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Venetria assigns that the juvenile court erred in finding that statutory grounds existed under § 43-292 (2) and (6) to support termination of her parental rights. She does not challenge the court's finding that statutory grounds existed to terminate her parental rights pursuant to § 43-292(7).

The grounds for terminating parental rights are codified in § 43-292. *In re Interest of Denzel D., supra*. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Denzel D., supra*. The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Denzel D., supra.* Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months."

The evidence established that Antonio was removed from Venetria's care on January 29, 2024, and had remained in out-of-home placement since his removal. The State filed the motion to terminate Venetria's parental rights on April 30, 2025, at which time Antonio had been in out-of-home care for 15 months. Therefore, we find that the State proved by clear and convincing evidence that grounds for termination under § 43-292(7) were satisfied.

Section 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights. *In re Interest of Denzel D., supra.* Thus, we need not address whether the evidence was sufficient to support termination under § 43-292(2) or (6) and we proceed to whether termination was in Antonio's best interests.

## 2. BEST INTERESTS

Venetria next assigns that the juvenile court erred in finding that termination of her parental rights was in Antonio's best interests. She argues that she made "good progress overall towards reunification with regards to the rehabilitative plan." Brief for appellant at 19. Venetria further argues that the juvenile court improperly found that she was an unfit parent "in the future" and failed to focus on Antonio's future well-being when deciding Antonio's best interests. Brief for appellant at 29-30.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. See, § 43-292; *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Cameron L. & David L., supra.*

Here, the record provides that Antonio was removed following concerns regarding Venetria's mental health, domestic violence between Venetria and Antonio's father, and Venetria's threats to kill Antonio. Venetria completed an initial diagnostic interview, which recommended a psychological evaluation. Venetria completed the psychological evaluation, which revealed significant mental health concerns and diagnoses, including schizoaffective disorder, due to episodes of depressed mood, mania, and hallucinations; unspecified anxiety disorder; post-traumatic stress disorder; and unspecified personality disorder, due to persistent difficulties with interpersonal functioning that do not clearly meet any other specific personality

disorder. The evaluation recommended that Venetria participate in therapy; that her substance use be monitored and, if she began utilizing substances, that she should be referred for a substance use evaluation; that she take her medications as prescribed; that she complete a parenting class and consistently participate in visitation with Antonio; that she engage in family support to help ensure she is accessing appropriate services to continue to make progress; that she speak with the domestic violence shelter to determine if there were any additional services that the shelter could provide to her; and that she engage in activities or groups to boost her support system.

Venetria challenges the juvenile court's finding that she is an unfit parent and that termination was in Antonio's best interests on the basis that she had made good progress overall towards reunification. But the record reflects differently. While Venetria certainly participated in some of the court ordered services and requirements aimed at parental reunification, her participation was inconsistent, delayed, and appears dictated by what Venetria was willing to do on her own terms. For instance, despite the court orders, Venetria failed to complete the Circle of Security parenting education program to which she was continuously referred by Olson; she failed to consistently engage in family support services, drug testing, and visitation; and she failed to attend CPP sessions. The record indicates that as to some of these court ordered services, Venetria did not participate or stopped attending because she did not believe she needed the assistance of the service. For example, Venetria testified during the trial that she stopped participating in drug testing because "I felt like it wasn't necessary so I stopped because . . . I felt like it wasn't needed . . . that I don't do anything." Due to Venetria's reluctance to engage with the school system to provide for Antonio's developmental needs, the court had to appoint Antonio's foster parents as his education surrogates to ultimately facilitate early education and developmental evaluations for Antonio. And due to inconsistencies associated with the visitation and other circumstances, Venetria's visitation with Antonio never progressed past therapeutic assisted visitation by the time the State filed its motion to terminate Venetria's parental rights. Additionally, during the pendency of the case, Venetria moved to South Dakota and indicated that she was no longer interested in participating in the case and desired to relinquish her parental rights.

We recognize that Venetria disputes the State's characterization of the nature and quality of her participation in services, including her mental health treatment, CPP, a parenting class, and Venetria's living arrangements throughout the case. For instance, Venetria contends that she completed all the required mental health evaluations, she followed the recommendations of the evaluations, she sought treatment by participating in medication management, she participated with a psychiatrist and therapist through CenterPointe, she saw and followed the advice of her primary care doctor, and she took her medications as prescribed. However, Olson testified that Venetria had not signed releases of information for specific treatment providers, and therefore Olson was unable to confirm Venetria's participation or progress in certain services. Olson testified that Venetria never provided her with a full name or contact information for her medication management provider or her therapist at CenterPointe or at the women's support program. Venetria further asserts that she was unaware that Christensen began CPP with Antonio in January 2025 as she did not learn that the service was being offered or that she was supposed to participate in the service until April 2025. Olson testified that Antonio was on the waitlist for CPP for a while but was eventually accepted around January 2025. Olson testified that she provided Christensen's contact information to Venetria but could not remember when and she

acknowledged that Venetria had indicated difficulties reaching the CPP therapist at some point during the case. Christensen testified that she had had six or seven appointments with Antonio since January 2025 and that following Antonio's initial appointment, she contacted Venetria to engage in CPP and that Venetria requested an appointment in May 2025 for which Venetria did not show. Christensen could not recall when she first made contact with Venetria, but she believed it was a month before their May 6, 2025, scheduled Zoom call. Christensen testified that Olson informed her that Olson provided Venetria with Christensen's contact information shortly after she began CPP, but that Venetria did not reach out to her prior to Christensen's contacting Venetria sometime in April 2025. Olson testified that Venetria had only participated in one of the three CPP sessions offered to her after Venetria and Christensen were able to establish communication. Venetria also argues that she completed a parenting class called Love and Logic and was able to discuss what she had learned and the skills she obtained from the class; however, Olson testified that she referred Venetria for the Circle of Security parenting class five times, and that Venetria failed to complete it or any parenting education course at any point during the case. Venetria also asserts that she maintained appropriate housing throughout the case, living at a women's support program from November 2024 through January 2025 and then with her current roommates. However, Olson testified that Venetria was kicked out of the women's program after failing to participate in required meetings and that although she was familiar with where Venetria was currently residing, Olson had not completed a walkthrough of the residence, due to Venetria's not participating in other services and failing to request that Olson complete a walkthrough. Although there is some dispute as to the extent of Venetria's participation, we defer to the findings of the juvenile court and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

Antonio was removed from Venetria's care in January 2024 due to circumstances that were dangerous to Antonio, including, but not limited to, Venetria's mental health conditions and threats to kill Antonio. And Venetria was ultimately diagnosed with very serious mental health conditions, including schizoaffective disorder, due to episodes of depressed mood, mania, and hallucinations; unspecified anxiety disorder; post-traumatic stress disorder; and unspecified personality disorder, due to persistent difficulties with interpersonal functioning that do not clearly meet any other specific personality disorder. And at the time of trial, Olson testified that she could not recommend reunification in the near future because there had been only minimal corrections of the behaviors that led to Antonio's removal. We agree.

We do not dispute Venetria's professed love for Antonio and acknowledge her participation in some of the services ordered by the court. But we are now over 2 years removed from Antonio's removal from Venetria's care, and on this record, it does not appear that reunification is possible in the foreseeable future. In short, when viewed against the serious circumstances which led to Antonio's removal, Venetria has failed to put herself in a position to reunify with Antonio, despite significant efforts by the State to assist her. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights, and last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Further, children cannot, and should not, be

suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.,* 32 Neb. App. 578, 3 N.W.3d 376 (2024).

Accordingly, we find that the State showed clear and convincing evidence that Venetria was unfit and that termination of her parental rights was in Antonio's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Venetria's parental rights.

AFFIRMED.